UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JIANQIAO LU,<br><br>      Plaintiff,<br><br>   v.<br><br>GEORGE HERMANS,<br>SULAHUDDEEN AZIM,<br>WESTCHESTER COUNTY,<br><br>      Defendants. | Case No.: 24-CV-_____<br><br>**COMPLAINT**<br><br>*JURY TRIAL DEMANDED* |

Plaintiff JIANQIAO LU, *pro se*, hereby alleges as follows:

**INTRODUCTION**

1. "[P]risoners retain the constitutional right to petition the government for the redress of grievances." *Turner v. Safley*, 482 U.S. 78, 84 (1987). And yet the Westchester County Department of Correction ("WCDOC") strives to chill—indeed, freeze—the exercise of that right by adopting a policy of retaliation against grievance writers. Falling prey to this scheme, I was slapped with a misbehavior report, stripped of four hard-earned jobs, and evicted from the jail "penthouse": all within hours of filing a grievance. Worse, I was later placed in keeplock for weeks and declared *persona non grata* for employment purposes. Lest WCDOC thinks it can operate as a Constitution-free zone, I seek compensatory and punitive damages in this 42 U.S.C. § 1983 action.

1

## PARTIES

2. I, Plaintiff Jianqiao Lu, am a 30-year-old citizen of China lawfully residing in the United States. At all relevant times herein, I was a pretrial detainee in the custody of WCDOC in Valhalla, New York. I continue to be incarcerated at WCDOC, awaiting trial by New York State.

3. Defendant George Hermans ("Captain Hermans"), sued in his individual capacity, was at all relevant times herein a duly sworn correctional captain at WCDOC, acting under color of state law.

4. Defendant Sulahuddeen Azim ("Captain Azim"), sued in his individual capacity, was at all relevant times herein a duly sworn correctional captain at WCDOC, acting under color of state law.

5. Defendant Westchester County (the "County") is a municipal organization existing under and by virtue of the laws of New York State, and is responsible for the policy, practice, procedure, supervision, implementation, and conduct of all matters pertaining to WCDOC.

## JURISDICTION AND VENUE

6. This action is brought pursuant to the First Amendment to the United States Constitution and 42 U.S.C. § 1983. This Court thus has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

7. Venue is proper in this district under 28 U.S.C. § 1391(b).

# FACTS

## The Prelude

8.      On October 25, 2021, I was remanded to the custody of WCDOC, pursuant to criminal charges filed by New York State.

9.      Shortly thereafter, I applied and was approved for employment within WCDOC. As a result, I was moved to 4NW, a housing unit reserved for inmate workers (known internally as "trustees"). 4NW is situated in the New Jail, the newest of three housing structures at WCDOC, and is colloquially referred to as the jail "penthouse" for its relatively comfortable conditions of confinement.

10.     Although inmate employment at WCDOC is highly competitive, with only one in about 18 residents ever hired, I managed to rise through the trustee ranks and eventually secure four coveted positions. Specifically, by September 2023, I was employed by the Paint Crew, the Captain's Crew (11PM-7AM), the Sanitation Detail (3PM-11PM), and the 3-Core Law Library.

11.     These trustee jobs generated a combined weekly pay of $195.00.[1] As an added benefit of my employment, I was provided daily access to meals and beverages that are unavailable to the general inmate population. This amounted to approximately $140.00 a week.

12.     On the night of September 18, 2023, while performing my assigned duties on the Captain's Crew, I was improperly targeted for a strip search. Officer C.B.,[2] who initiated the strip search, claimed that I was to be strip searched on a daily basis "per departmental policy and procedure." But I had never been strip searched in the preceding 14 months doing the same job,

---

[1] Or $10,140.00 annually—a not insignificant sum for an incarcerated person.

[2] WCDOC employees who are not parties to this action are referred to herein by their initials.

nor did Officer C.B. provide any written policy upon request. I complied with the strip search, which yielded negative findings.

### The Protected Activity

13.  On September 19, 2023, I filed a grievance (the "First Grievance"), challenging the propriety of the strip search. That same night, I was once and again strip searched without reasonable suspicion. The next day, I submitted another grievance (the "Second Grievance").[3]

14.  On September 20, 2023, for the third night in a row, I was ordered to strip naked for no valid reason, the sanctity of my body violated and the last shred of my dignity taken away.

15.  On September 21, 2023, at approximately 8:30 PM, I handed a third grievance (the "Third Grievance") concerning the strip searches to Captain Hermans, who was at the time working overtime as the Sector Supervisor for 4NW, my housing unit.

16.  In the Third Grievance, I reiterated that the ongoing strip searches were unlawful and part of "a personal vendetta designed to humiliate and dehumanize rather than to achieve legitimate penological objectives," and stated that I would seek judicial intervention should the strip searches persist.[4]

### The Adverse Action

17.  On September 22, 2023, at around 7:45 AM, I was aroused from sleep by a loud bang on my cell door. I was subsequently handcuffed and removed from my cell while a shakedown took place. The search left my cell in shambles, with legal papers scattered all over the floor and family photos damaged by water.

---

[3] The First Grievance was ultimately denied by Sergeant W.N. and the Second Grievance inexplicably disappeared.

[4] Although the strip searches were unlawful, they are not at issue in this action, which focuses on First Amendment retaliation.

18.     On information and belief, Captain Hermans, in his role as the Shift Commander that morning, ordered that my cell be searched.

19.     Soon after the shakedown, at around 8:30 AM, Sergeant S.B. arrived on 4NW and returned the Third Grievance to me, stating that Captain Hermans would not accept it because "the grievance form wasn't filled out correctly."

20.     Then, around 10 AM, I corrected the purported error on the grievance form and resubmitted the Third Grievance to Sergeant S.B.—my fate was sealed at this point.

21.     No more than 45 minutes later, at about 10:45 AM, Sergeant S.B. materialized yet again, this time handing me a misbehavior report and charging me with (1) "Disorderly Conduct" and (2) "Possession of Any Contraband."

22.     Specifically, the misbehavior report alleged that assorted "contraband," including pens, highlighters, and a paper clip had been discovered during the cell search. The report also claimed that a Thanksgiving-themed sticker sheet found in my cell had "tested positive" for a substance considered "contraband," without specifying what substance it was.[5]

23.     I then explained to Sergeant S.B. that I believed I was allowed to have the stationery items because during past cell searches they had never been confiscated from my cell.

24.     I also contested the veracity of the other contraband charge. The sticker sheet in question, I told Sergeant S.B., had previously been tested and cleared by the Mail Room and delivered to me along with a set of Thanksgiving-themed greeting cards.[6] I offered to show her the package receipt.

---

[5] It bears note that I was charged with "Possession of Any Contraband," a class 3 infraction, and not "Possession of a Controlled Substance," a more serious, class 4 infraction. It is unclear what chemical compound could constitute "contraband" but not a "controlled substance."

[6] Per WCDOC policy, all incoming mail and packages are swabbed and tested for contraband.

25. Sergeant S.B. informed me that the matter was "above her pay grade" and that she was just "following orders."

26. On information and belief, Captain Hermans ordered his subordinates to fabricate the contraband charges and to create the misbehavior report.

27. After receiving the misbehavior report, I was promptly suspended from work, evicted from 4NW, and transferred to a different housing unit—again by order of Captain Hermans.

28. Worse still, following the incident, Captain Hermans embarked on a weeks-long smear campaign to destroy my reputation. On information and belief, he falsely and repeatedly claimed to other WCDOC staff, including my work supervisors, that I had possessed drugs.[7]

29. On September 26, 2023, I appeared before Captain Azim, then WCDOC's Disciplinary Hearing Officer, for disposition of the misbehavior report. Captain Azim, at the outset of the hearing, remarked that "I see why your cell got searched"—an unmistakable reference to my grievance filing.

30. I admitted at the hearing to possessing the stationery items but maintained my innocence as to the sticker sheet. I requested to provide documentation that I had received the stickers in an approved package, which request was summarily denied. I was found guilty of all charges listed on the misbehavior report.

31. Despite a spotless disciplinary record and my stellar performance as a trustee for nearly two years, I was sentenced to 20 days' punitive confinement ("keeplock") and exiled to

---

[7] This lie even spilled over to my state criminal proceeding. During a November 28, 2023 hearing, the prosecutor in my case falsely claimed that I was in possession of controlled substances at WCDOC.

the Old Jail, a section of WCDOC notorious for its harsh conditions. I was also terminated from all my job assignments.

32. At the time of my firing, I was one of the most senior and highest paid trustees at WCDOC. My abrupt removal from 4NW and banishment to the Old Jail thus sent shock waves throughout the trustee group. By orchestrating this stunt, Defendants intended to send a message to all trustees: "Keep your mouth shut, or you'll be next."

33. The message rang loud and clear. On information and belief, for a period following my September 22, 2023 ouster, the number of inmate grievances originating from 4NW sharply decreased. In other words, the adverse action described herein had an objective chilling effect on inmates of ordinary firmness and discouraged them from exercising their First Amendment rights.

34. I was also subjectively chilled by Defendants' actions. For one thing, I did not appeal Captain Azim's disciplinary decision in fear of further retaliation. Despite the squalid and inhumane conditions in the Old Jail, I dared not file another grievance while housed there. To this day, I am still apprehensive about using the grievance system ever again.[8]

35. Moreover, the loss of income, the forced separation from coworkers and friends, and the character assassination perpetrated by Defendants have left me in a profound state of emotional distress. These events would be life-altering in the outside world, and are all the more traumatizing behind prison walls. As a result of Defendants' actions, I have suffered bouts of depression and anxiety, and have on three occasions sought mental health intervention.[9]

---

[8] I did begrudgingly file one grievance in October 2023 for the sole purpose of exhausting administrative remedies with respect to this action.

[9] To be clear, I am not seeking compensatory damages on the basis of these emotional injuries. *See* 42 U.S.C. § 1997e(e).

36. Although my keeplock status ended on October 16, 2023, and although WCDOC policy permits reemployment of an inmate 30 days after any disciplinary action, I have neither been reinstated to any of my previous positions nor had success applying for a different job. On information and belief, Defendants continue to deter their subordinates from rehiring me.

## The Causal Connection

37. In addition to the unusually suggestive temporal proximity between my filing of grievances and the adverse action described above, Defendants' retaliatory motives can be gleaned from the following facts.

38. *First*, on September 28, 2023, I received a response from Sergeant S.B. regarding the Third Grievance, in which she attributed the strip searches I had endured to the discovery of "contraband" in my cell. This, of course, was a flat-out lie, unless time runs backwards at WCDOC.

39. Recall, the strip searches in question had occurred between September 18 and 20, 2023, and the purported contraband was not found until the morning of September 22, 2023.

40. Put differently, the cell search and the subsequent misbehavior report were part of an effort, orchestrated by Captain Hermans, to retroactively manufacture reasonable suspicion to justify the strip searches that were the subject of the Third Grievance.

41. *Second*, and relatedly, the adverse action was designed to thwart my ongoing challenge to WCDOC's strip search policy. Because I was being strip searched during one of my job assignments, to remove me from that position would effectively put a stop to the strip searches and render my complaint moot.

42.     But there was no excuse to summarily fire me—after all, I was completing my assigned tasks and complying with the strip searches. And so in a calculated attempt to engineer a fireable offense, Captain Hermans ordered the cell shakedown and the fabrication of the contraband charge.

43.     By stripping me (no pun intended) of ALL my jobs, Captain Hermans ensured that no more grievances (or, for that matter, lawsuits) could be filed in connection with the strip searches.

44.     *Third*, Captain Azim was predisposed to retaliating against grievance filers due to his conflicting responsibilities. As mentioned before, Captain Azim served as WCDOC's Disciplinary Hearing Officer, responsible for disposing of all inmate disciplinary matters. But at the same time, he was also WCDOC's Grievance Coordinator, tasked with liaising between the jail and the New York State Commission of Correction ("NYSCOC"), the final authority in the state's three-step grievance review process.

45.     In the latter capacity, Captain Azim was incentivized to prevent meritorious inmate complaints from reaching NYSCOC and to present a rosy image of WCDOC to the same body. As a result, he was intimately familiar with all pending inmate grievances.

46.     Captain Azim's dual roles, however, represented a glaring conflict of interest that subjected frequent grievance filers to improper disciplinary sanctions. Indeed, I myself was put in keeplock for 20 days—a punishment grossly disproportionate to my purported offense and typically reserved for serious infractions such as attacking another inmate or threatening a staff member.

47.     In short, Captain Azim's competing interests resulted in a vicious cycle of retaliation that further discouraged WCDOC residents from exercising their First Amendment rights.

48.     *Last but not least*, numerous uniformed staff at WCDOC have commented on Defendants' retaliatory animus. For example, shortly after I was moved to the Old Jail, Officer A.G., whom I had previously worked under, remarked that "I heard you were set up," referencing the false contraband charge.

49.     Around the same time, Officer J.A. jokingly called me a "fucking idiot" for handing Captain Hermans a grievance. Sergeant C.C. shared the same sentiment.

50.     Officer I.A. suggested that I "write to Captain Hermans" and tell him I have "learned my lesson."

51.     Officers T.A., K.B., and B.C., when asked whether I could return to work, indicated that it would be "up to Captain Hermans."

52.     More recently, Captain J.A. observed that I am unlikely to get another job because I "pissed off the wrong captain," also referring to Captain Hermans.

**Retaliation as Municipal Policy**

53.     The constitutional violation alleged herein was not an isolated event. To the contrary, it was the result of Westchester County's longstanding policies and widespread practices of failing to adequately train and supervise WCDOC employees on their obligations not to retaliate against grievance filers, and failing to discipline those who knowingly violate inmates' constitutional rights.

54. The County has long been on actual or constructive notice that WCDOC staff routinely retaliate against inmates who utilize the grievance system to voice their concerns. Past lawsuits filed in this district have alleged just this type of misconduct. *See*, *e.g.*, *Ross v. Correct Care Solutions LLC*, No. 11-CV-8542(DLC) (S.D.N.Y.) (Plaintiff alleged retaliation by WCDOC officials; case settled in 2014); *Santiago v. Westchester County*, No. 13-CV-1886(LGS) (S.D.N.Y.) (Same; settled in 2015); *Gomez v. Westchester County*, No. 18-CV-0244(NSR) (S.D.N.Y.) (Retaliation claim survived motion to dismiss but plaintiff failed to further pursue the case.).

55. In a more recent case, *George v. County of Westchester*, No. 20-CV-1723(KMK), 2021 WL 4392485 (S.D.N.Y. Sept. 24, 2021), the plaintiff was issued a false misbehavior report for filing grievances and later punished by keeplock and the loss of good time. Although his retaliation claim survived a motion to dismiss, the plaintiff unfortunately died before he could further prosecute the action.

56. The County has also been on notice that inmates have a First Amendment right to file grievances without fear of retaliation. In addition to the thorough court opinions issued in the aforementioned actions, which clearly and explicitly set out the law, the U.S. Department of Justice ("DOJ") has cautioned—over a decade ago—that WCDOC may not retaliate against grievance filers.

57. Specifically, in early 2008, DOJ conducted an on-site inspection at WCDOC to identify civil rights violations. On November 30, 2009, DOJ published a 42-page Findings Letter, available at http://tinyurl.com/2p8br7zh and incorporated herein by reference, in which it

detailed a litany of systemic failures that had caused "serious harm" to WCDOC residents. DOJ Letter at 2.

58. Relevant here, DOJ found that WCDOC "fail[ed] to maintain an adequate detainee grievance system," and stressed that "[i]nmates should be able to file their grievances in a secure and confidential manner and *without threat of reprisals*." DOJ Letter at 16 (emphasis added).

59. Despite having been put on notice of a clear pattern of illegal retaliation against grievance filers at WCDOC, Westchester County stood by idly and did nothing to train, supervise, or discipline jail staff. This inaction effectively condones, ratifies, and sanctions the kind of misconduct that Defendants perpetrated on me in this case.

60. The policies and practices described above were consciously approved by County policymakers who were deliberately indifferent to the constitutional protections afforded to incarcerated people.

## COUNT I: First Amendment Retaliation

61. I hereby reallege and incorporate by reference all preceding paragraphs.

62. As described above, I engaged in an activity protected by the First Amendment, to wit: the filing of grievances.

63. As described above, Defendants took adverse action against me, to wit: the targeted shakedown, the fabricated misbehavior report, the cell transfer, the punitive confinement, the termination from job assignments, the defamation of character, and the ban on reemployment.

64. As described above, there was a clear causal connection between my protected conduct and the adverse action.

65. Accordingly, Defendants unlawfully retaliated against me in violation of my First Amendment rights.

## COUNT II: *Monell* Liability

66. I hereby reallege and incorporate by reference all preceding paragraphs.

67. As described above, Westchester County condoned, permitted, encouraged, or ratified policies, practices, or customs that enabled WCDOC personnel to deliberately, recklessly, and repeatedly retaliate against grievance filers without consequence.

68. As described above, County policymakers acted with deliberate indifference toward my constitutional rights by failing to train, supervise, or discipline WCDOC staff.

69. Accordingly, the County is liable for Defendants' misconduct under *Monell v. Dep't of Soc. Svcs.*, 436 U.S. 658 (1978).

## RELIEF SOUGHT

WHEREFORE, I respectfully request that the Court:

    A.    Enter judgement in my favor and against Captain Hermans, Captain Azim, and Westchester County;

    B.    Award compensatory damages, including but not limited to lost wages, in an amount determined by a jury;

    C.    Award punitive damages, by reason of the wanton, willful, and malicious nature of the misconduct described herein, in an amount determined by a jury;

    D.    Grant any other relief this Court deems just and proper.

## PLRA EXHAUSTION

All available administrative remedies have been exhausted with respect to the claims set forth in this complaint.

## PREVIOUS LAWSUITS

I have filed one previous lawsuit while incarcerated, *see Lu v. Rocah*, No. 22-CV-9715(NSR) (S.D.N.Y.). That case was dismissed without prejudice on June 28, 2023.

## JURY DEMAND

I hereby demand a trial by jury pursuant to Fed. R. Civ. P. 38(b) on all issues so triable.

Dated: February 12, 2024
       Valhalla, New York

Respectfully submitted,

<u>/s/ Jianqiao Lu</u>
Jianqiao Lu (He/Him/His)
*Pro Se* Plaintiff[10]

WCDOC #265008
PO Box 10
Valhalla, NY 10595-0010
lu@luvhermans.com

---

[10] To expedite filing and improve legibility, this document was telephonically transcribed by a non-incarcerated individual under my direction. No attorney assisted in the preparation of this complaint.

15

## VERIFICATION

I have read the foregoing complaint and hereby verify that the matters alleged herein are true, except as to matters alleged on information and belief, and, as to those, I believe them to be true. I certify under penalty of perjury that the foregoing is true and correct.

Executed in Valhalla, New York                                          /s/ Jianqiao Lu
On February 12, 2024                                                     Jianqiao Lu